IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHARIS McCRARY and
DARNETTA TYUS,

      **Plaintiffs,**

      **v.**

CITY OF COLLEGE PARK,
GEORGIA,

      **Defendant.**

CIVIL ACTION NO.
1:23-CV-1733-SDG-CCB

## ORDER & NON-FINAL REPORT AND RECOMMENDATION

Plaintiffs Sharis McCrary and Darnetta Tyus bring this action against Defendant City of College Park, Georgia, asserting claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* (Title VII) and claims of discrimination under the Equal Protection Clause of the United States Constitution pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is before the Court for consideration of Defendant's motion to dismiss the complaint, (Doc. 9), Defendant's motion to sever, (Doc. 10), and Plaintiffs' motion to strike, (Doc. 13). The Court **RECOMMENDS** that Defendant's motion to dismiss be **DENIED** and that Defendant's motion to sever be **DENIED without prejudice**. The Court **GRANTS** Plaintiffs' motion to strike.

## I.     BACKGROUND

The Court draws the following factual allegations from the complaint, (Doc. 1), which are assumed to be true for the purposes of this discussion.

### A.     College Park's Governing Structure

College Park is a municipality of around 14,000 people located in Fulton County, Georgia. (Doc. 1 at ¶ 13). College Park is governed by a city charter that establishes a four-member city council elected by geographic districts. *Id.* at ¶ 14. Under the charter, the City Council is the sole policy-making entity for College Park. *Id.* at ¶ 15. At the time of the events giving rise to Plaintiffs' complaint, the Council consisted of two White men, Ambrose Clay and Ken Allen, and two Black men, Joe Carn and Roderick Gay. *Id.* at ¶ 16. Bianca Motley Broom, a Black woman, was the city's mayor. *Id.*

The charter also establishes a City Manager, appointed and subject to termination by the City Council, who is responsible for the daily operations of College Park. *Id.* at ¶ 17. The City Manager is authorized to appoint department head positions, subject to ratification by the City Council. *Id.*

Under the terms of the charter, the Chief of Police reports directly to the City Manager but has authority over the daily management of the police department. *Id.* at ¶ 18. The longstanding custom and practice in College Park has been that the

Chief of Police exercises his or her personnel authority independently of direction or interference from the City Council. *Id.* at ¶ 19. However, College Park has enacted a set of standard operating procedures to regulate the Chief's administration of personnel duties. *Id.*

### B.     Plaintiff McCrary's Employment by Defendant

McCrary is a twenty-year employee of the College Park police department. *Id.* at ¶ 20. She was selected as Deputy Chief of the department in 2018. *Id.* In 2019 and 2020, there was talk that McCrary may become the city's first Black female Chief of Police, and several community advocates petitioned for her to be appointed. *Id.* at ¶ 21. Mayor Broom asked McCrary to publicly announce that she had no ambition to become Chief. *Id.* at ¶ 22. McCrary declined to do so, and Mayor Broom remarked that McCrary becoming Chief "is not going to happen." *Id.* at ¶ 23.

In April 2021, the then-current Chief of Police was ordered to resign. *Id.* at ¶ 24. For over twenty years, when the Chief resigned or was terminated, the Deputy Chief would be elevated to the role of interim Chief until an official search and hiring process could be completed. *Id.* at ¶ 25. McCrary was not installed as interim Chief. *Id.* at ¶ 26. Instead, College Park hired a White male, Thomas Kuzniacki (who had retired from the department in 2011), as interim Chief. *Id.*

3

Around that time, McCrary sent a confidential letter to Mayor Broom and the City Council asking for an explanation as to why she was not promoted as interim Chief. *Id.* at ¶ 28. None of the Council members responded; however, Mayor Broom discussed the email with McCrary in person and "hinted" that the all-male Council was hesitant to permit McCrary to ascend to the Chief's position. *Id.* at ¶ 29. In September 2021, McCrary was appointed as interim Chief. *Id.* at ¶ 30.

In her role as interim Chief, McCrary experienced various forms of interference from the City Council. *Id.* at ¶ 37. Council members directed McCrary to demote certain higher-ranking officers and replace them with Council allies in the police department. *Id.* Council members referred to McCrary by her first name, a departure from the military-like deference often afforded to senior police personnel. *Id.* at ¶ 38. On one occasion, a Council member brought a high-ranking police officer into McCrary's office and asked him, "What kind of job do you think she is doing?" *Id.* at ¶ 39. The member then said, "you need to step it up if you want to keep this job." *Id.* On another occasion, a Council member told McCrary that he was not inclined to support the appointment of a female Chief of Police because "look at what happened the last time" a woman was put in charge of a

public safety department—an apparent reference to the unsuccessful tenure of a female fire chief. *Id.* at ¶ 40.

McCrary encountered difficulties in dealing with Jackson Myers, who was named interim City Manager by the Council. *Id.* at ¶¶ 50, 52. Myers is a White male. *Id.* at ¶ 50. Myers often delayed or ignored McCrary's leave requests. *Id.* at ¶ 52. He also denied payments for McCrary's leadership training invoices, expenses that had been routinely approved for McCrary's predecessors who served as the interim Chief of Police. *Id.* Myers was openly dismissive of McCrary and often interrupted her presentations. *Id.* at ¶ 53.

In late summer 2022, McCrary lodged an internal complaint with the City Council and the Mayor regarding the way that Myers treated her. *Id.* at ¶ 54. On several occasions, McCrary discussed Myers's behavior with the Council, making clear that she believed he was disrespecting her because of her gender. *Id.* Council members responded that she had to "take it" if she wanted to be Chief. *Id.*

In early fall of 2022, Colonel David Block of the city's police department informed McCrary that the Council had authorized him to offer her a deal to become Chief. *Id.* at ¶ 56. Block is a White male. *Id.* Under this arrangement, McCrary would appoint Block as Deputy Chief and would allow for him to be the

5

police department's primary contact with the Council. *Id.* In other words, Block would be the main decisionmaker, whereas McCrary would be the "public face" of the department. *Id.* Block told McCrary that if she declined the deal, the Council would make the same offer to another Black female contender. *Id.* at ¶ 57. Block explained that the selection of a Black female Chief would make it impossible for McCrary to pursue legal action against the Council. *Id.* McCrary rejected Block's proposal. *Id.* at ¶ 58. McCrary believes that no such offer would have been made to a male candidate for Chief of Police. *Id.*

In the fall of 2022, Myers appointed a search committee of three men and one woman to hire the Chief of Police. *Id.* at ¶ 59. On November 1, 2022, the search committee formally interviewed McCrary for the position. *Id.* at ¶ 60. Two weeks later, a female city official told McCrary that she had been offered a spot on the search committee on the condition that she not support McCrary's hiring. *Id.* at ¶ 61. This official did not accept the appointment. *Id.* On November 21, 2022, McCrary was informed by email that she was not selected for the Chief's position. *Id.* at ¶ 62. On November 22, 2022, Connie Rogers, a former lieutenant in College Park and the deputy chief of South Fulton, was announced as Chief of Police. *Id.* Rogers is a Black female. *Id.* at ¶ 63. Within days of her appointment, she sought

6

input from several high-ranking officers about potentially elevating Block to the Deputy Chief position. *Id.* However, after the media reported about the Council's schemes to appoint a Black woman as a figurehead Chief while Block served as Deputy Chief, Rogers "found it untenable to follow through with Block's appointment." *Id.* at ¶ 64. McCrary has since returned to serve as Deputy Chief. *Id.* at ¶ 65. However, she alleges that she has been consistently excluded from sensitive department decisions. *Id.*

### C.    Plaintiff Tyus's Employment by Defendant

In February 2022, Darnetta Tyus was named City Manager of College Park and given a three-year contract. *Id.* at ¶ 32. Tyus was tasked with finding a candidate for the Chief of Police. *Id.* at ¶ 33. In support of that effort, Tyus hired an Atlanta-based Black female executive search consultant, Dele Lowman-Smith. *Id.*

From the beginning of her appointment, Tyus experienced obstacles from the all-male Council. *Id.* at ¶ 34. Council members began to directly engage the various heads of the municipal departments, instead of going to Tyus. *Id.* at ¶ 35. Council members directed Tyus not to speak when council members questioned the department heads. *Id.* Female staffers and department heads informed Tyus that the Council's interactions with her differed substantially from the deferential

7

approach they had taken with the last non-interim City Manager, Terrance Moore. *Id.* at ¶ 36. Moore is a Black male. *Id.* at ¶ 31.

In the last week of May of 2022, Tyus notified the Council that she was going to review the search consultant's list of top-rated candidates for Chief of Police and that she would present the Council a final list of four candidates for interviews and vetting by mid-June of 2022. *Id.* at ¶ 44. On June 6, 2022, Mayor Broom notified Tyus that the Council had voted to terminate Tyus's contract. *Id.* at ¶ 45. Later that day, the City Attorney of College Park informed Tyus that she would be presented with an option of resigning with a severance package before the Council's termination vote was announced. *Id.* at ¶ 47. However, within hours, social media and newscasts reported that Tyus had been fired, eliminating the possibility of resigning. *Id.* After Tyus's termination, one Council member approached McCrary and told her that Tyus was trying to recruit plaintiffs for a "girl's lawsuit." *Id.* at ¶ 49. He warned McCrary to "steer clear" of the litigation if she wanted to be Chief. *Id.*

At the point of her termination, Tyus had been City Manager for four months. *Id.* at ¶ 45. During her tenure, she facilitated an 11.5-million-dollar bond issue for an economic development project; completed a budget process that

raised the pay of municipal employees and police officers without raising taxes; and secured funding for much needed capital equipment. *Id.* at ¶ 46.

Tyus was replaced by Jackson Myers, a White male. *Id.* at ¶ 50. Myers restarted the Chief of Police search from scratch and hired Warren Hutmacher, a White male consultant based in Alpharetta, Georgia to assist the search. *Id.*

### D. Other College Park female employees

Other female staffers observed the Council's disrespectful treatment of McCrary and Tyus and told both McCrary and Tyus that they believed the city's culture was rife with belittling and demeaning behavior toward women. *Id.* at ¶ 41. A Council member told one female department head that she was "stupid." *Id.* at ¶ 42. Another female employee was told that she needed to lose weight and that she was "too big." *Id.* A Council member told yet another female department head that she needed to do something with her hair. *Id.* On one occasion, Mayor Broom was publicly chastised by a Council member who said, "Bianca, do you get off on interrupting me? If you don't stop . . . I'm going to take you downtown." *Id.* at ¶ 43.

## II. MOTION TO STRIKE

Plaintiffs filed a motion to strike their original response in opposition to Defendant's motion to dismiss and to substitute the corrected response in

opposition. (Doc. 13). Plaintiffs' corrected response included minor changes from their original response. *See id.* at 1 n.1. Defendant did not file a response to Plaintiffs' motion. Under this Court's Local Rules, a "[f]ailure to file a response shall indicate that there is no opposition to the motion." LR 7.1(B), NDGa. As such, the Court **GRANTS** Plaintiffs' motion to strike, (Doc. 13), and substitutes their corrected response, (Doc. 12), in place of the original response, (Doc. 11).

## III.   MOTION TO DISMISS

### A.   Legal Standard

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a plaintiff need not include "detailed factual allegations" in the complaint, the requirement to demonstrate the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, Rule 8 requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when

10

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

These standards suggest a two-pronged approach for courts evaluating a motion to dismiss a complaint. *See id.* at 678–79; *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). First, "eliminate any allegations in the complaint that are merely legal conclusions." *Am. Dental Ass'n*, 605 F.3d at 1290. While a court must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), it need not consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678. Nor should it consider "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Second, "where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 679).

**B.      Discussion**

**1.      Plaintiff McCrary's Discrimination Claims under Title VII and Section 1983**

McCrary brings mixed-motive claims of race and sex discrimination under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution through Section 1983 (Counts I & III). Title VII provides that it is unlawful for "race, color, religion, sex, or national origin [to be] a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).[1] "Discrimination claims brought under Title VII and § 1983 are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). Mixed-motive claims are not examined under the burden shifting *McDonnell Douglas*[2] framework. *Id.* at 1239.[3] Instead, courts ask (1) whether the

---

[1] "[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 n.9 (11th Cir. 2016) ("Title VII and § 1983 discrimination claims involving similar facts warrant the same evidentiary framework.").

[2] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

[3] In *Quigg*, the Eleventh Circuit explained that the *McDonnell Douglas* "framework is fatally inconsistent with the mixed-motive theory of discrimination

defendant took an adverse employment action against the plaintiff; and (2) whether the plaintiff's protected characteristic was a motivating factor for the defendant's action. *Id.*

In Count I, McCrary alleges that Defendant discriminated against her on the basis of her sex and race in violation of the motivating-factor provision of Title VII when it failed to appoint her as Chief of Police. (Doc. 1 at ¶ 69). In Count III, McCrary alleges that Defendant discriminated against her for reasons at least partly motivated by her sex in violation of the Equal Protection Clause pursuant to 42 U.S.C. § 1983. *Id.* at ¶ 77. To state a claim for disparate treatment, an employee must "provide enough factual matter to plausibly suggest intentional discrimination." *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1253 (11th Cir. 2017). At a minimum, a Title VII/Section 1983 plaintiff must ultimately be able to show that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (alteration in original).

---

because the framework is predicated on proof of a single, 'true reason' for an adverse action." 814 F.3d at 1237.

Here, McCrary alleges that she was subjected to an adverse employment action when Defendant failed to promote her to Chief of Police. (Doc. 1 at ¶ 69). "[G]enerally the denial of a promotion is an adverse employment action." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). The Court, therefore, considers McCrary's claim that her sex and/or race were a motivating factor in the decision. McCrary offers at least the following allegations in support of her mixed-motive claims. Mayor Broom asked McCrary to make a public statement that she had no ambition to become Chief of Police. (Doc. 1 at ¶ 22). When McCrary declined to do so, Mayor Broom commented that McCrary's being promoted "was not going to happen." *Id.* at ¶ 23. McCrary interpreted Broom's comment to mean that the all-male City Council would resist appointing a female, or a Black female, Chief. *Id.* While McCrary served as interim Chief, a Council member told her that he was not inclined to support the appointment of a female Chief of Police because of what happened the last time College Park put a woman in charge of a public safety department, referencing the unsuccessful tenure of a female fire chief. *Id.* at ¶ 40. In early fall of 2022, Colonel David Block, a White male senior officer, informed McCrary that the City Council would support her appointment as Chief if she would appoint Block as Deputy Chief and would

14

allow for him to be the police department's primary contact with the Council. *Id.* at ¶ 56. Block explained that if McCrary declined the deal the Council would select another Black female candidate as Chief to make it impossible for McCrary to bring a legal claim. *Id.* at ¶ 57.

Defendant challenges McCrary's discrimination claims on three grounds, arguing that: (1) McCrary alleges no facts to suggest that a *majority* of the Council acted with discriminatory or retaliatory animus; (2) she fails to allege that no reasonable person would have selected Rogers as Chief of Police over her; and (3) as to Count III, she fails to identify any specific policy or custom that resulted in any alleged violation of the Equal Protection Clause. (Doc. 9 at 12–14, 16–18). The Court addresses each argument in turn.

Defendant's first argument focuses on the fact that the complaint does not allege that a majority of the Council acted with discriminatory animus. Defendant argues that "only those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability." (Doc. 9 at 12 (quoting *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002))). [4]

---

[4] Defendant maintains that this rationale has been applied with equal force to claims of discrimination under Title VII. (Doc. 9 at 13 (citing *Conner v. Lafarge N. Am., Inc.*, 343 F. App'x 537, 544 (11th Cir. 2009))).

Therefore, Defendant argues, where the alleged discrimination was made by a group consisting of multiple members—such as the City Council—Defendant can be subject to liability only if the Council itself acted with an unconstitutional or discriminatory motive. *Id.* Defendant suggests that there is no allegation that a majority of the Council acted with discriminatory animus and cites decisions—none of which were decided at the motion-to-dismiss stage—where the Eleventh Circuit held that liability can be imposed only when the majority of a group's members shared an unlawful motive. (Doc. 9 at 12–13 (citing *Matthews*, 294 F.3d at 1297; *Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001); *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994); *Conner*, 343 F. App'x at 544)[5]; *see also* Doc. 15 at 3–5 (arguing that *Quigg*, 814 F.3d at 1241, stands for the proposition that in a discrimination suit against a municipality, a plaintiff's protected characteristic must be a motivating factor for at least a majority of the votes for the alleged adverse action)). McCrary argues that, in a mixed-motive

---

[5] In *Matthews*, the defendant appealed the district court's denial of judgment as a matter of law. 294 F.3d at 1296. In *Mason*, the plaintiff appealed the district court's grant of summary judgment for the defendants. 240 F.3d at 1339. In *Church*, the defendant filed an interlocutory appeal seeking to vacate the preliminary injunction entered in the plaintiff's favor. 30 F.3d at 1335. And in *Conner*, the plaintiff appealed the district court's order of summary judgment for the defendant. 343 F. App'x at 540.

case, the motivations of one or some of the members of a decision-making body are sufficient to taint the overall decision. (Doc. 12 at 10–12).

It is telling that none of the authority Defendant cites in its motion involves cases at the motion-to-dismiss stage. And in reply, Defendant cites only one case decided at the motion-to-dismiss stage which suggests that, to survive a motion to dismiss, a complaint must specifically allege that a majority of the voting members of a city council each individually possessed discriminatory animus. (Doc. 15 at 4–5 (citing *McCarthy v. City of Cordele*, No. 1:22-CV-72 (LAG), 2023 WL 2783679, at *4–6 (M.D. Ga. Mar. 31, 2023), *appeal filed*, No. 23-11036 (11th Cir. Mar. 31, 2023))). In *McCarthy*, the district court held that "[e]vidence that one of three commissioners who voted to terminate Plaintiff's employment had an improper motive is not sufficient to impute an unconstitutional motive to the Commission as a whole." 2023 WL 2783679, at *4 (internal quotation marks and footnote omitted). However, *McCarthy* is distinguishable from the case at bar for several reasons. First, unlike the plaintiff in *McCarthy*, *see id.* at *2, McCrary brings only *mixed-motive* claims under Title VII and Section 1983. Second, the plaintiff in *McCarthy* alleged only *one* instance of discriminatory intent on behalf of *one* county commissioner. *Id.* at *4. McCrary, on the other hand, has alleged multiple instances

17

that plausibly suggest discriminatory intent on behalf of multiple City Council members and the Council as a whole. *See also Bivins v. Franklin*, No. 1:22-CV-4149-WMR, 2023 WL 6194104, at *10 (N.D. Ga. Aug. 10, 2023) (denying a motion to dismiss as to the county defendant where the plaintiff alleged that a majority of the board of commissioners took adverse employment actions against the plaintiff with a shared unconstitutional motive), *appeal filed*, No. 23-13029 (11th Cir. Sept. 8, 2023).[6]

Even if the Court accepts Defendant's premise—that McCrary must allege that the majority of the City Council acted with discriminatory animus—I find that she sufficiently alleges discriminatory animus as to multiple City Council members and to the Council as a whole. First, she alleges that one Council member told her that he was not inclined to support the appointment of a female Chief of Police because of "what happened the last time" College Park installed a woman as head of a public safety department. (Doc. 1 at ¶ 40). Second, McCrary recounts that she raised concerns about Myers's gender discriminatory behavior against her to several Council members on multiple occasions; in response, the Council

---

[6] The appeal in *Bivins* was filed by one of the individual defendants in the case, not the county government. *See* No. 1:22-CV-4149-WMR (Doc. 66 N.D. Ga. Sept. 8, 2023).

members told her to put up with his behavior if she wanted to become Chief of Police. *Id.* at ¶ 54. Third, at the direction of the City Council, Colonel Block informed McCrary that the Council would support her appointment as Chief if she would appoint Block as Deputy Chief and would allow him (a White male officer) to be the police department's primary contact with the Council. *Id.* at ¶ 56. Block further relayed the Council's threat that, if McCrary declined the deal, they would offer the job to another Black woman which, in the Council's view, would ensure that McCrary could not sue. *Id.* at ¶ 57. McCrary also alleges instances where she was subjected to demeaning behavior by the Council that she believes male employees in her role would not have experienced. *See id.* at ¶¶ 37–39, 49.

Finally, it is worth noting that unlike *Bivins* and *McCarthy*,[7] the Court here lacks necessary information regarding the relevant vote the Council took and how the members voted. Based on the complaint, it is not clear how many Council members participated in the ratification of Myers's decision to hire Rogers as Chief (instead of McCrary) or how the members voted. But the fact that there are

---

[7] In *Bivins*, the county board voted three to two to terminate the plaintiff as its chief financial officer. 2023 WL 6194104, at *1. In *McCarthy*, the city commissioners voted three to one to replace the plaintiff as city manager. 2023 WL 2783679, at *1.

19

unknowns at this stage in the litigation is not surprising—discovery is designed to uncover this kind of information. And that is why, at the motion-to-dismiss stage, the complaint need only "plausibly suggest that the plaintiff suffered an adverse employment action due to intentional . . . discrimination." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).[8]  As such, the Court finds that McCrary plausibly alleges that the Council acted with a discriminatory motive so as to support a discrimination claim under Title VII and Section 1983.[9]

Defendant's second argument is that, for a failure-to-promote claim, a plaintiff must plead that no reasonable person could have chosen the candidate selected over the plaintiff. (Doc. 9 at 14). Both cases that Defendant cites in support of its argument, however, analyzed single-motive claims under the *McDonnell Douglas* framework and were decided at summary judgment. *See id.* (citing

---

[8] Though *Surtain* involved an appeal of a denied motion for default judgment, the Eleventh Circuit has "interpreted the [default judgment] standard as being akin to that necessary to survive a motion to dismiss for failure to state a claim." 789 F.3d at 1245.

[9] Of course, the Court offers no view on the merits of McCrary's claims against Defendant and whether discovery will support her position that the City Council acted with a discriminatory motive. All I find is that, at this stage, McCrary alleges enough facts for Counts I and III to survive Defendant's motion to dismiss.

*Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344 (11th Cir. 2007); *Porter v. Am. Cast Iron Pipe Co.*, 427 F. App'x 734, 736 (11th Cir. 2011)). On the other hand, Plaintiff argues that the no-reasonable-person theory does not apply to mixed-motive claims. (Doc. 12 at 13–14).

Again, the Court need not decide who has the better of the legal arguments because, even assuming Defendant is correct that the "no reasonable person" standard applies, Defendant offers no authority to suggest that a plaintiff need establish it in her complaint. Here, at the motion-to-dismiss stage, McCrary is only required "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. It is enough, as explained above, that she has alleged facts suggesting that the Council acted discriminatorily. Indeed, requiring a plaintiff to plead the specifics about the person who was selected over her, i.e., to definitively meet the "no reasonable person" standard, would be particularly onerous at this point.

Finally, Defendant's third argument advances a misreading of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny. (Doc. 9 at 17–18 (arguing that McCrary can only impose liability on Defendant "if the alleged violation occurred pursuant to a governmental policy or custom")). A municipality, such as Defendant, may not be held liable under Section 1983 on a theory of *respondeat*

*superior*. *Monell*, 436 U.S. at 691. Rather, Section 1983 liability can be imposed on a municipality if (1) a plaintiff's constitutional rights were violated; (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citation omitted). However, a violation pursuant to a policy or custom is *not* the only way to impose Section 1983 liability on a municipality because "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). "[F]or instance, . . . a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id.* (citing *Owen v. City of Independence*, 445 U.S. 622 (1980); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)).

The fact that McCrary does not identify a policy or custom of Defendant that resulted in her being denied a promotion to Chief of Police does not vitiate her

ability to state a claim under Section 1983.[10] Here, the City Council has the final policymaking authority for Defendant. (Doc. 1 at ¶ 15). Defendant's City Manager is authorized to make appointments for department head positions, such as the Chief; however, that authority is subject to ratification by the Council. *Id.* at ¶ 17. In November of 2022, McCrary was informed that she had not been selected as Chief. *Id.* at ¶ 62. Instead, Defendant hired Rogers, another Black female, in the role. *Id.* Given Defendant's structure, the Council had to have ratified the selection of Rogers as Police Chief in order for the decision to take effect. Therefore, the choice of Rogers over McCrary was a direct action of the Council, and the Council members "who have final policymaking authority [can] by their actions subject [Defendant] to § 1983 liability." *Church*, 30 F.3d at 1342.[11]

---

[10] To be fair, in the response, McCrary contends that she pleads sufficient facts to establish an unofficial custom or policy of discrimination by Defendant to impose liability under Section 1983. (Doc. 12 at 19–20). Because the Court finds that liability could be imposed under the *Pembaur* rule, it declines to address an alternative theory of liability at this time.

[11] Although Rogers is a Black female, McCrary specifically alleges that the City Council threatened that if she did not accept the power-sharing role with Block and agree to be a figurehead Chief, it would select another Black woman in an effort to preclude McCrary from bringing a discrimination suit. (Doc. 1 at ¶¶ 56–57). McCrary also alleges that a City Council member told her that he was not inclined to support the appointment of a female Chief of Police because "look at what happened the last time" a woman was put in charge of a public safety department—an apparent reference to the unsuccessful tenure of a female fire

For all the reasons discussed above, the Court **RECOMMENDS** that Defendant's motion to dismiss be **DENIED** as to Counts I and III.

### 2.    Plaintiff McCrary's Retaliation Claim under Title VII

Title VII also acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A prima facie case of retaliation under Title VII requires the plaintiff to show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some causal relation between the two events. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). Although for the purposes of a motion to dismiss a plaintiff need not allege facts sufficient to establish a prima facie case,[12] she must provide

---

chief. *Id.* at ¶ 40. For present purposes, Plaintiff has alleged enough to survive a motion to dismiss.

[12] "[T]he requirements for establishing a prima facie case under *McDonnell Douglas* . . . [do not] apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss" because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

enough factual matter (taken as true) to suggest discriminatory retaliation. *See Marshall v. Mayor & Alderman of Savannah*, 366 F. App'x 91, 100 (11th Cir. 2010).

In Count II, McCrary alleges that Defendant retaliated against her for engaging in protected activity by failing to appoint her as Chief of Police. (Doc. 1 at ¶ 73). McCrary alleges that she engaged in the protected activity of (1) making internal complaints of sex-based discriminatory conduct by interim City Manager Myers and (2) rejecting a power-sharing arrangement that she reasonably believed would have placed restrictions on the Police Chief role that would have never been imposed on a male Chief. *Id.* at ¶ 72. Defendant argues that McCrary does not plausibly allege that she engaged in a protected activity. (Doc. 9 at 14–16). McCrary counters that even if some of Myers's conduct is not actionable, she was denied and/or delayed personal leave and reimbursement requests, and she rejected Block's offer of a power sharing arrangement between her as Chief and Block as Deputy Chief. (Doc. 12 at 14–16). In reply, Defendant argues that McCrary never complained about leave or reimbursement requests being rejected due to her race or sex. (Doc. 15 at 7). Defendant also argues that McCrary's rejection of Block's

---

support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (internal quotation marks omitted).

proposal cannot constitute protected activity because it was not objectively reasonable for her to believe that the City Council was discriminating against her on the basis of sex. *Id.* at 8–9.

"Statutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits." *Gerard v. Bd. of Regents*, 324 F. App'x 818, 825 (11th Cir. 2009). Title VII equally protects "individuals who have filed formal complaints" and those "who informally voice complaints to their superiors." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002). To establish statutorily protected expression, a plaintiff's burden involves "both a subjective and an objective component." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). A plaintiff must plausibly allege that she subjectively believed that her employer engaged in unlawful discrimination and that her belief was objectively reasonable. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). A plaintiff "need not prove that the conduct [s]he opposed was actually unlawful, but the reasonableness of [her] belief that [her employer] engaged in an unlawful employment practice must be measured against existing substantive law." *Id.* (citation and internal quotation marks omitted).

Here, McCrary alleges that she lodged an internal complaint with the City Council and Mayor Broom regarding Myers's behavior toward her. (Doc. 1 at ¶ 54). McCrary also pleads that on multiple occasions, she discussed Myers's conduct with several Council members and was clear that Myers's disrespectful treatment of her was "rooted in" her gender. *Id.* The Council members allegedly responded that McCrary needed to "take it" if she wanted to become Chief of Police. *Id.*

Defendant attaches an email from McCrary to the City Council and Mayor Broom that discusses Myers's behavior. (Doc. 9-1). In Defendant's view, "this 'internal complaint' makes only generalized references to 'unprofessional treatment' and disrespect, and wholly fails to connect this treatment with McCrary's race or sex." (Doc. 9 at 16). However, according to the complaint, this email was not her only complaint to the City Council reporting Myers's behavior. She also spoke to the Council members about Myers on several occasions and indicated that it was her belief Myers's treatment of her was "rooted in" her gender. (Doc. 1 at ¶ 54).

The Court finds that McCrary sufficiently alleges that she engaged in protected activity by making complaints to the City Council. First, she alleges that

she believed Myers's disrespectful behavior toward her was "rooted in" her gender, which supports the notion that she subjectively believed that his conduct was unlawful. *Id.* Second, she also sufficiently pleads that her perception of Myers's behavior as being unlawful was objectively reasonable. McCrary alleges that Myers delayed or ignored her leave requests and refused to pay for her leadership training, expenses that had been routinely approved for her predecessors. *Id.* at ¶ 52. Because denying reimbursement requests based on an employee's sex is unlawful under Title VII, *see Cook v. City of Birmingham*, No. 2:17-CV-01654-RDP, 2020 WL 136850, at *7 (N.D. Ala. Jan. 13, 2020) (holding that denied reimbursement for a training conference was an actionable adverse action); *Lockwood v. Coastal Health Dist. 9-1*, No. 2:16–CV-123, 2018 WL 715433, at *5 (S.D. Ga. Feb. 5, 2018) (holding that a denied reimbursement was an actionable adverse action), construing all factual allegations in McCrary's favor, she had a good faith, reasonable basis for bringing complaints about Myers to the City Council.

Defendant insists that McCrary never "complained about leave or reimbursement requests being rejected *due to her race or sex*." (Doc. 15 at 7). But the complaint alleges that Myers refused to pay for McCrary's leadership training invoices and that she complained on multiple occasions to several Council

28

members that she believed Myers was treating her differently due to her gender. (*See* Doc. 1 at ¶¶ 52, 54). The allegations in the complaint are sufficient to link Myers's conduct and McCrary's gender-based complaints.

Because I find that McCrary plausibly alleges that she engaged in protected activity based on her complaints to the City Council regarding Myers's rejection of her leave and reimbursement requests, at this juncture, I will not consider whether her complaints regarding Myers's other conduct or her rejection of Block's power-sharing arrangement amount to protected activity as well.

Defendant makes a cursory argument that McCrary cannot show causation for her retaliation claim. (Doc. 9 at 16 ("McCrary also fails to allege non-conclusory facts to show the City's selection of another candidate for police chief was in retaliation for her letter complaining of 'unprofessional treatment' or any other purported protected conduct.")). Proof of a causal connection for a retaliation claim requires only a showing "that the protected activity and the adverse action were not wholly unrelated." *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 639 (11th Cir. 2021) (quoting *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)). Defendant fails to support this single sentence with any citation of authority or argument explaining its position. As such, the Court declines to

consider it. *See Nat'l Lab. Rels. Bd. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.")). Therefore, the Court assumes—but does not decide—that McCrary has sufficiently pled a causal link between her protected activity and her denied promotion.

As such, the Court **RECOMMENDS** that the motion to dismiss be **DENIED** as to Count II.

### 3. Plaintiff Tyus's Discrimination Claims under Title VII and Section 1983

In Count IV, Tyus brings a Title VII motivating-factor claim against Defendant. (Doc. 1 at ¶ 82). Tyus alleges that Defendant terminated her for reasons at least partly motivated by her sex in violation of 42 U.S.C. § 2000e-2(m). *Id.* In Count V, Tyus alleges that Defendant, while acting under the color of law, violated the Equal Protection Clause by terminating her from her position as City Manager for reasons at least partly motivated by her sex. (Doc. 1 at ¶ 86). As discussed with respect to McCrary's discrimination claims, a Title VII/Section 1983 plaintiff must allege that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the

defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (alteration in original).

Here, Tyus alleges that the adverse employment action taken against her was her termination as City Manager. (Doc. 1 at ¶¶ 82, 86). "Termination is an ultimate employment action that is undeniably adverse." *Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 894 (11th Cir. 2008). Thus, the Court must evaluate whether Tyus plausibly alleges that her sex was a motivating factor in her termination. Tyus offers the following allegations in support of her mixed-motive claims. In February 2022, Tyus was hired as the City Manager on a three-year contract. (Doc. 1 at ¶ 32). The City Council tasked her with reviving the search for a Chief of Police. *Id.* at ¶ 33. Within a month, Tyus hired an Atlanta-based Black female executive search consultant to lead the search efforts. *Id.* From the beginning of her tenure, Tyus encountered obstacles from the all-male Council, who persisted in inserting themselves into daily municipal operations. *Id.* at ¶ 34. Council members began to bypass Tyus and directly engage the heads of Defendant's municipal departments. *Id.* at ¶ 35. Tyus also alleges that various female staffers and department heads informed Tyus that she was being treated very differently by the Council than her male predecessor, Terrance Moore. *Id.* at

¶¶ 31, 36. Approximately a week after Tyus updated the Council on the Chief of Police search, Mayor Broom told Tyus that the City Council had voted to terminate her contract. *Id.* at ¶ 45. Tyus had worked for Defendant for around four months. *Id.* She was provided no explanation for her termination. *Id.*

In a similar vein to Defendant's attacks on McCrary's discrimination claims, Defendant argues that: (1) Tyus provides no factual matter to suggest intentional sex discrimination, (Doc. 9 at 19); (2) she fails to show that a majority of the City Council acted with discriminatory animus, (*id.* at 19–20); and (3) she fails to allege that an official policy or unofficial practice or custom of the City Council resulted in her discrimination, (*id.* at 20–21).

As to Defendant's first argument, Tyus responds that she has presented enough factual material for a plausible mixed motive claim by alleging the systematically less favorable treatment of Tyus than her male predecessor, Tyus's strong job performance, the curious timing between Tyus's firing and her identification of Police Chief candidates, and the poor treatment of other female employees by Defendant. (Doc. 12 at 22–23). Though it is a close call, the Court ultimately finds that Tyus has pled sufficient allegations to survive Defendant's motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

Even at the summary judgment stage, the Eleventh Circuit has characterized a plaintiff's evidentiary burden on a mixed-motive claim as "light." *Burton v. Gwinnett Cnty. Sch. Dist.*, 756 F. App'x 956, 930 (11th Cir. 2018); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (holding that a plaintiff's burden for "a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim").[13] Tyus alleges that the City Council treated her differently than her male predecessor by inserting themselves into daily municipal operations, by circumventing Tyus to engage directly with the various department heads, and by generally treating her with less deference. (Doc. 1 at ¶¶ 34–36). The City Council filled Tyus's position by hiring a White male as interim City Manager. *Id.* at ¶ 50. The Court finds that Tyus has sufficiently alleged that her sex was a motivating factor in the City Council's vote to terminate her. *See Quigg*, 814 F.3d at 1239.

---

[13] In *Quigg*, the Eleventh Circuit adopted the mixed-motive framework identified by the Sixth Circuit in *White*. 814 F.3d at 1238–39.

Defendant further contends that Tyus must show that a majority of the City Council acted with discriminatory animus. (Doc. 9 at 19–20). Here, Tyus alleges that the City Council, as a whole, treated her differently on the basis of her sex as compared to her male predecessor. As such, the Court finds that Tyus plausibly alleges that the City Council acted with a discriminatory motive so as to support a discrimination claim under Title VII and Section 1983.[14]

Finally, Defendant argues that Tyus fails to identify an official policy or unofficial custom or practice of Defendant that resulted in her termination. (Doc. 9 at 20). In response, Tyus makes a similar argument as McCrary contending that there is no requirement that she show an official or unofficial custom or policy of discrimination to establish municipal liability. *Id.* at 24. As discussed in regard to McCrary's Section 1983 claim, a violation pursuant to a policy or custom is *not* the only way to impose Section 1983 liability on a municipality because "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480.

---

[14] Again, the Court offers no view on the merits of Tyus's claims against Defendant or the likelihood that discovery will support her position that the City Council acted with a discriminatory motive. All I find is that, at this stage, Tyus alleges enough facts for Counts IV and V to survive Defendant's motion to dismiss.

The fact that McCrary does not identify a policy or custom of Defendant that resulted in her termination is not fatal to her mixed-motive claim under Section 1983. Here, the City Council has final policymaking authority for Defendant. (Doc. 1 at ¶ 15). Pursuant to Defendant's charter, the City Manager is appointed and subject to termination by the City Council. *Id.* at ¶ 17. On June 6, 2022, Mayor Broom informed Tyus that the City Council had voted to terminate Tyus's contract. *Id.* at ¶ 45. Therefore, the choice to terminate Tyus was a direct action of the City Council, and the City Council members "who have final policymaking authority [can] by their actions subject [Defendant] to § 1983 liability." *Church*, 30 F.3d at 1342.

For all the reasons discussed above, the Court **RECOMMENDS** that Defendant's motion to dismiss be **DENIED** as to Counts IV and V.

## IV. MOTION TO SEVER

Defendant moves to sever Plaintiffs' claims under Federal Rule of Civil Procedure 21. (Doc. 10). Rule 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party" and "may also sever any claim against a party." Fed. R. Civ. P. 21. When deciding a motion to sever, courts are also guided by Federal Rules of Civil Procedure 20 and 42. *See Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1322–23 (11th Cir. 2000), *overruled on other grounds by Manders*

*v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc). Rule 20 provides that "[p]ersons may join in one action as plaintiffs if . . . they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and . . . any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). Thus, "[a] party seeking joinder of claimants under Rule 20 must establish two prerequisites: 1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and 2) some question of law or fact common to all persons seeking to be joined." *Alexander*, 207 F.3d at 1323.[15]

"The Federal Rules, however, also recognize countervailing considerations to judicial economy." *Id.*; *see also* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate . . . claims . . . ."). And to that end, courts have considered

---

[15] In determining what constitutes a transaction, occurrence, or series of transactions or occurrences, courts look to precedent construing Rule 13(a) for guidance. *Alexander*, 207 F.3d at 1323. Accordingly, to satisfy the first prong of Rule 20(a), courts in this Circuit have looked at whether the claims are logically related. *See, e.g.*, *Smith v. Trans-Siberian Orchestra*, 728 F. Supp. 2d 1315, 1319 (M.D. Fla. 2010) (citing *Republic Health Corp. v. Lifemark Hosp. of Fla.*, 755 F.2d 1453, 1455 (11th Cir. 1985)). Claims have "a logical relationship when the same operative facts serve as the basis of both claims." *Republic Health*, 755 F.2d at 1455 (internal quotation marks omitted).

"whether severance would facilitate settlement or judicial economy, and the relative prejudice to each side if the claim is severed." *Breaking Glass Pictures, LLC v. Does 1-99*, No. 1:13-CV-882-AT, 2013 WL 8336085 (N.D. Ga. Apr. 12, 2013).

Both McCrary and Tyus allege that they were subjected to sex-based discrimination by Defendant in violation of Title VII and Section 1983. (Doc. 1 at ¶¶ 69, 77, 82, 86). Although Defendant suggests in its brief that the City Council made the decision to fire Tyus and the City Manager made the decision not to promote McCrary, (Doc. 16 at 4), the allegations in the complaint suggest that the City Council had to make or ratify the relevant decisions as to both Plaintiffs.[16] (Doc. 1 at ¶ 45, 62; *see also id.* at ¶ 15 (alleging that the City Manager's appointments of department heads are subject to ratification by the City Council)). Tyus was terminated in June of 2022, *id.* at ¶ 45, whereas McCrary was passed over

---

[16] Defendant's argument that there are different decisionmakers is perplexing. (Doc. 16 at 4). The complaint plainly alleges that the City Manager possesses the final decision-making authority over the appointment of all department heads, "subject to ratification by the Council." (Doc. 1 at ¶ 15). As such, the complaint alleges, the City Manager makes the appointment decision as to the Chief of Police, and the Council has to ratify it. Maybe discovery will reveal that something else happened, that the allegations in the complaint misstate the City's charter, or that to "ratify" the decision has a meaning different than that commonly afforded that term. But for present purposes, the Court must accept the allegation that the City Council had to ratify the City Manager's decision to appoint Rogers (and not McCrary) as Chief of Police.

for Chief of Police in November of 2022, *id.* at ¶ 62. The Plaintiffs further allege that the City Council treated them both in a belittling and degrading manner, *id.* at ¶¶ 34–39, and that numerous female staffers employed by Defendant believed that "the culture in City Hall was rife with belittling and demeaning behavior toward women who worked in city government," *id.* at ¶ 41.

As to the first requirement under Rule 20(a)(1), accepting all of the Plaintiff's allegations as true, "the Plaintiffs' claims stem from the same core allegation that they were subject to a *systemic* pattern or practice of [sex]-based discrimination" against female city government employees by the City Council. *Alexander*, 207 F.3d at 1324. Regarding the second requirement, the discriminatory nature of the City Council's conduct is "plainly common to each plaintiff's recovery." *Id.* And the fact that Tyus and McCrary suffered different effects—discrimination in termination or in failure-to-promote—from the alleged pattern of discrimination does not preclude a finding of a common question of law and fact. *Id.* As to judicial economy and prejudice, the Court sees no harm in allowing the Plaintiffs to proceed jointly in discovery. "It may be, upon development of the evidence in this case, that it ultimately appears that the claims of the [two] plaintiffs should be severed for trial. At this point in the proceedings, however, judicial economy is

served by joinder, rather than proceeding in duplicative suits with duplicative discovery." *Weatherly v. Ala. State. Univ.*, No. 2:10-CV-192-WHA, 2010 WL 1753190, at *3 (M.D. Ala. Apr. 30, 2010). As such, the Court **RECOMMENDS** that the motion to sever, (Doc. 10), be **DENIED without prejudice** so that Defendant is allowed to re-raise this issue at an appropriate time before trial, should Defendant choose to do so.[17]

## V.      CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that Defendant's motion to dismiss, (Doc. 9), and motion to sever, (Doc. 10), be **DENIED**. The Court **GRANTS** Plaintiffs' motion to strike, (Doc. 13).

**IT IS SO ORDERED AND RECOMMENDED,** this 12th day of February, 2024.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

---

[17] At the end of the day, Defendant offers no compelling reason why proceeding through separate discovery phases, in two different cases, would be prejudicial. On the other hand, it seems likely that there will be many witnesses who might be deposed in both cases on similar topics. As such, the strongest argument for denying the motion at this time is that it is simply premature. If discovery suggests that these cases are better tried separately, Defendant will be free to make that argument again well prior to trial. At this point, the question of whether to sever the cases seems premature, and given the substantial factual overlap, allowing them to proceed together through discovery is neither prejudicial nor inefficient.